·POSTAL TELEGRAPH CABLE CO. v. AKRON CEREAL CO.

1. UNCONDITIONAL ACCEPTANCE OF CONTRACT BY WIRE—MISTAKE.

An unconditional acceptance of an offer by wire to furnish certain supplies at a price named, constitutes a contract binding the sender of the message, though the price named is erroneous. and not the price given by the sender to the telegraph company.

2. FACTS FAILING TO ESTABLISH COMPLETED CONTRACT.

Where A telegraphed B asking the latter the price at which he would furnish five thousand sacks of grits, and B, intending to fix the price at 6 3-4, sent a

Telegraph Co. v. Cereal Co.

message in which, by mistake of the telegraph company, the price named was 6.34, whereupon A answered that he would take 2,000 sacks at 6.34, and B replied by letter that "we have your order for two thousand sacks and will let you have them at our price, 6 3-4," there was no completed contract to furnish the goods at 6.34, and B is not liable for failure or refusal so to do; and B, having elected to furnish the goods at 6.34 is not entitled to recover from the telegraph company the difference in price.

3. BREACH OF CONTRACT—DUTY OF PARTY INJURED.

The law imposes upon the parties subjected to injury by the breach of a contract the active duty of making reasonable exertions to render the injury light as possible. If the party injured through negligence or willfulness allows the damage to be unnecessarily enhanced, the increased loss falls on him.

**Allen & Cobbs,** for plaintiff in error.

**Slabaugh & Seiberling,** for defendant in error, cited:

Telegraph companies are not insurers but are liable for loss occasioned by their negligence and cannot contract against such liability. 25 Am. & Eng. Enc. Law (1 ed.), 749; Telegraph Co. v. Griswold, 37 Ohio St. 301 [41 Am. Rep. 500].

Failure to transmit a message in the form received is *prima facie* evidence of negligence. Telegraph Co. v. Griswold, 37 Ohio St. 301, 313 [41 Am. Rep. 500]; 25 Am. & Eng. Enc. Law (1 ed.), 831; Rittenhouse v. Telegraph Co., 44 N. Y. 264 [4 Am. Rep. 673].

A telegraph company is under the legal duty to transmit a message without error or delay, and is liable in damages for any injury of which its negligence is the proximate cause. 25 Am. & Eng. Enc. Law (1 ed.), 778, 780; Telegraph Co. v. Griswold, 37 Ohio St. 301 [41 Am. Rep. 500].

Cipher and untelligible messages are the same as any other when explained to the company, or when understood by the trade and company. 25 Am. & Eng. Enc. Law (1 ed.), 842, 845, 849; Pepper v. Telegraph Co., 11 S. W. Rep. 783 [87 Tenn. 554; 4 L. R. A. 660; 10 Am. St. Rep. 699.]

Or when importance is disclosed on face of message although not intelligible. Telegraph Co. v. Griswold, 37 Ohio St. 314 [41 Am. Rep. 500].

The dispatch in the case at bar is not a cipher dispatch and is sufficiently intelligible to acquaint the telegraph company with its importance. Joyce on Elec. Law, p. 778; Tyler v. Telegraph Co., 60 Ill. 421 [14 Am. Rep. 38]; Rittenhouse v. Telegraph Co., *supra*; Pepper v. Telegraph Co., *supra*; Carland v. Telegraph Co., 76 N. W. Rep. 762 [118 Mich. 369; 43 L. R. A. 280].

Starting a dispatch incorrectly from the sending office is evidence of gross negligence. The company is bound to send it literally. Tyler v. Telegraph Co., 60 Ill. 421 [14 Am. Rep. 38].

In all the cases above cited the courts held that the abbreviated form of the message was sufficient to show the importance and nature of the same, and the telegraph company was held responsible in damages for the erroneous transmission. The presumption is that the message was received as sent. Joyce Elec. Law, p. 1045.

Evidence is competent to show that the telegraph company had notice of the importance of the same. Joyce Elec. Law, p. 1044; 25 Am. & Eng. Enc. Law (1 ed.), 846.

The telegraph operator is the company's agent in receiving the message and his admissions are competent against the telegraph company. Carland v. Telegraph Co., 76 N. W. Rep. 762 [118 Mich. 369; 43 L. R. A. 280]; Morse v. Railway Co., 72 Mass. 450.

The telegraph company is to be regarded as the agent of the party sending the dispatch, and the sender of the message is bound by its terms as delivered to the addressee however much it may have become changed in the process of transmission. Joyce Elec. Law, pp. 904, 905; 25 Am. & Eng. Enc. Law (1 ed.), 890; Dunning v. Roberts, 35 Barb. 463; Saveland v. Green, 40 Wis. 431; Tyler v. Telegraph Co., 60 Ill. 421 [14 Am. Rep. 38]; Ayer v. Telegraph Co., 10 Atl. Rep. 495 [79 Me. 493; 1 Am. St. Rep. 353]; Morgan v. People, 59 Ill. 58; Western Union Telegraph Co. v. Blanchard, 68 Ga. 299 [45 Am. Rep. 280]; Squire v. Telegraph Co., 98 Mass. 232 [93 Am. Dec. 157]; Telegraph Co. v. Schotter, 71 Ga. 760.

The telegraph company is liable to the cereal company for the difference between the price stated in the message as delivered to Bosch and the value of the goods. 25 Am. & Eng. Enc. Law (1 ed.), 849; Joyce Elec. Law, p. 964; Ayer v. Telegraph Co., *supra.*

Parol evidence is admissible to show the meaning to the trade of "634 guilders," taken with the context. Western Union Telegraph Co. v. Collins, 25 Pac. Rep. 187 [45 Kas. 88]; Carland v. Telegraph Co., *supra*; 25 Am. & Eng. Enc. Law (1 ed.), 836; 1 Am. & Eng. Enc. Law (2 ed.), 99, 100; People v. Brown, 55 N. Y. 200; Abbott's Trial Brief, 25.

As to acceptance and completion of the contract. 7 Am. & Eng. Enc. Law (2 ed.), 125, 126, 130, 131; Beach on Cont. 58, 61; Telegraph Co. v. Griswold, *supra*; Trevor v. Wood, 36 N. Y. 306 [93 Am-Dec. 511].

Knowledge of the error does not excuse the defendant if a contract existed. Telegraph Co. v. Griswold, *supra*; Ayer v. Telegraph Co. *supra*; Trevor v. Wood, *supra*; Durkee v. Railway Co., 29 Vt. 127; Telegraph Co. v. Schotter, *supra.*

HEARD on error.

MARVIN, J.

The case of the Postal Telegraph Cable Company against the Akron Cereal Company comes into this court upon a petition in error, seeking to reverse the judgment of the court of common pleas.

Suit was brought in that court by the defendant in error against the plaintiff in error upon this state of facts:

One N. A. Bosch, of Maastricht, Holland, had some correspondence with the Akron Cereal Company, of this city, in relation to the purchase by the former from the latter of certain goods known as distillers' grits. This correspondence was prior to November 29, 1898. By such correspondence it was known to the cereal company that if Bosch wanted to wire it asking price for such grits he would use the word "cotation" (spelled a little after the Holland way), meaning "quotation," but the word "cotation" was used. But, further, it was known by both parties that the word "sack" meant a certainty quantity of the grits. With this knowledge on the part of both, Bosch, on November 29, 1898, cabled the cereal company in these words: "Cotation 5,000 sacks." This meant to both the sender and the cereal company, "At what price can you furnish five thousand sacks of distillers' grits?"

To this, on the next day, November 30, the cereal company sent to the Postal Telegraph Cable Company for transmission by cable to Bosch the following: "63dx4 guilders cif Rotterdam December January." This meant to the sender that it would furnish five thousand sacks of distillers' grits, including cost of insurance and freight, at Rotterdam, Holland, at six and three-quarters guilders per sack, to be delivered in December, 1898, and January, 1899; and if it had been sent as it ought it would have meant this to Bosch. The letters "dx" between the figures "3" and "4" meant, both to the sender and to the telegraph company, that a hyphen was to be placed between these two figures.

The telegraph company undertook to transmit this as received by it to Bosch at Maastricht. Instead, however, of sending it as delivered, it sent a message to Bosch in these words: "634 guilders cif Rotterdam December January." This was, and might well be, understood by Bosch as offering to send the five thousand sacks at the price of 6.34 guilders per sack instead of six and three-fourths; that is, 6.75 per sack, so that by the mistake of the telegraph company the price given to Bosch was 41-100 guilders less than that given by the cereal company to the telegraph company. This, on each one thousand sacks, would make a difference of four hundred and ten guilders, or, under the evidence in this case, that a guilder is worth forty cents of our money, it would make a difference of $164 per thousand sacks.

Assuming that the telegraph company was the agent of the cereal company in such wise that what it said to Bosch should he held to be the act of the cereal company, and, in our view of the case, that assumption can be made and do no prejudice to either party; no discussion is had as to an argument made here upon the question of whose agent the telegraph company was.

An unconditional acceptance of this proposition would have constituted a contract binding the cereal company to furnish to Bosch five thousand sacks of grits at $164 less per thousand sacks than the price it really fixed for the goods; that is to say, that would be true if the figures "634" meant (and they properly meant) 6.34. Some discussion was had here as to whether Bosch was justified in understanding the figures "634" to mean 6.34 guilders. As has already been said, it was agreed between the parties, or, if it has not been stated, it was agreed between the parties that the price should be given in guilders.

Now, since six hundred and thirty-four guilders would be certainly so much that Bosch must have known it did not mean that, there can be little doubt that it was properly understood by Bosch as meaning 6.34 guilders. That being true, what has already been said, that if there had been an unconditional acceptance of this offer, and assuming that the telegraph company is the agent of the sender, the cereal company would have been bound to furnish five thousand sacks at 6.34 guilders per sack.

On December 3, 1898, Bosch cabled the cereal company in these words: "Accept 1,000 each month." This meant to each of the parties that Bosch would take one thousand sacks of grits in December, 1898, and one thousand in January, 1899, at an agreed price. To Bosch it meant at 6.34; to the cereal company it meant 6 3-4, or seventy-five hundreths. If this modified proposition to take two thousand sacks instead of five thousand sacks in December and January had been accepted without explanation or condition, assuming, as before, the agency of the telegraph company, the cereal company would have been bound to deliver the goods at 6.34.

The cereal company did not have the grits on hand, but decided to furnish the two thousand sacks at 6 3-4 guilders, which it understood to be the agreed price. Thereupon it ordered them from the Cumberland Mills, at Nashville, Tennessee; and at once, on the day of this last cable message, it wrote Bosch a letter, put it into the mail at Akron, and in that letter the cereal company said: "We beg to confirm our cable to you quoting 6 3-4 guilders per hundred kilos in one hundred kilo bags for our choice white brewer's grits cif Rotterdam; also to confirm your acceptance received this morning of one thousand bags each month, meaning December and January shipments. We have, therefore, entered

your order for one thousand sacks, etc." That letter was received by Bosch on December 15, 1898. Whatever notice then Bosch ever received that the cereal company had accepted his offer for one thousand sacks each for the months of December and January, he got by this letter; and this letter notified him that the acceptance was at 6 3-4 guilders instead of 6.34.

It is said that when the cereal company mailed that letter it thereby accepted the modified order for two thousand sacks instead of the proposition to furnish five thousand sacks, and that there was no change in the price, and that, therefore, it should be held that the cereal company became bound to furnish the two thousand sacks at 6.34.

Suppose, instead of mailing that letter, the agent of the cereal company, by some means, could have talked with Bosch on that day, and said to him: "Mr. Bosch, we had notified you we would furnish you five thousand sacks at a price; we have now got your order for two thousand sacks at a price, and we will let you have them, that price being 6 3-4," all in one conversation, all at the same time, is it possible there would have been any binding contract on the cereal company to furnish at 6.34, when at the very time they say to Bosch, we propose to furnish you the two thousand sacks that you want at the price that we have heretofore offered you, to-wit, 6 3-4? It seems clear that Bosch would not have been able to enforce that contract, that he could not have recovered damages if the cereal company refused to furnish those goods at less than 6 3-4.

Bosch wrote a letter on December 3, to the cereal company. That letter is found in the bill of exceptions. It is somewhat difficult to read, and it is not necessary to read it. It is a letter in which he, on that same third of December, stated to the cereal company that he begged to confirm his order by cable for two thousand sacks at 6.34. That was received by the cereal company on December 17.

Now, if there was ever a contract between the cereal company and Bosch, it seems very difficult to fix any time when that contract was completed. First, Bosch says, "What will you furnish me five thousand sacks for?" The Cereal Co. said,—what was received by Bosch said (giving the most favorable interpretation to the cereal company), "6.34." Bosch said, "I will not take five thousand sacks at that price, but I will take two thousand sacks at the price you have fixed," Bosch having got it that the price fixed was 6.34. The cereal company said, We have your order for two thousand sacks, and we will let you have them at our price, 6 3-4. Bosch said, "I won't take them at that price, but I insist on the 6.34." When was the contract completed between Bosch and the cereal company? We think it clear there never was a contract com-

pleted between them. There never was a time when Bosch could have held the cereal company under a contract to furnish two thousand sacks at 6.34. Up to this time, although the cereal company had determined that it would furnish, supposing it was to get 6 3-4 for the goods, and had ordered them, no goods had been shipped at all.

Several days after both parties knew of this mistake. The cereal company sent on the goods, and it thereafter settled with Bosch at 6.34, Bosch insisting that he had a right to them at that price; although, if we are right, no contract had been made by which it was bound to do it, it did it; furnished the goods at 6.34, and now sues the telegraph company for the difference, and recovered just the amount, $164 per thousand sacks, which, under this evidence, would be the difference between the price at 6.34 and 6 3-4.

This case was tried to the court without the intervention of a jury, but the measure of damages allowed by the court is determined by the difference between the price of these goods at 6.34 and the price at 6 3-4.

The law is well settled, that for its negligence to send messages as delivered to it, a telegraph company is liable in damages, if damages are thereby occasioned. Of course, this does not mean it is an insurer, but it means it puts upon the company the burden of showing a suitable and good reason why; it did not send what was furnished it as is said in Western Union Tel. Co. v. Griswold, 37 Ohio St. 301, it may show possibly that by act of God or the public enemy it was unable to send, atmospheric conditions may have rendered it impossible but, *prima facie* the company is liable for the mistake it makes; but it is liable only for the damages which result naturally, proximately and necessarily from such mistake as is made.

In this case there is no question about the negligence of the telegraph company. It was clearly negligent, for it is shown here that it understood that the message as it reached it meant 6 3-4, and it did not send it that way.

The cereal company here was damaged at least to the extent of what it paid for the message which was sent. It may have been damaged beyond that for something else it did, but, if so, there is no evidence as to anything about it. We don't know, it might not have been, and possibly there is something else by which it was damaged, possibly the expense of negotiating with the Cumberland Mills for the goods. However, there is no evidence about that here.

The court was, in error, in its measure of damages. The measure of damages was not to be determined by the difference between the price that Bosch understood the goods to be and the price the cereal company understood the goods to be, because there never was any con-

tract between the cereal company and Bosch that it should deliver those goods at that price of 6.34.

Our attention is called to the case of the Western Union Tel. Co. v. Griswold, *supra*. Counsel in this case are very familiar with that case. It is clearly to be distinguished from this. In that case a message was sent by the agent of Griswold & Company from Canada asking if he should purchase flax seed, a certain number of bushels at $1.50 per bushel. The telegraph company, instead of putting that $1.50 made it one five. Griswold & Co. immediately notified their agent to buy the goods. Here is the answer. "Yes, if seed is prime, and we can hold at London until spring."

Attention is called to that in the argument of this case, suggesting that here was not an unconditional acceptance of an offer. This was an instruction by Griswold & Co. to their own agent, in answer to a dispatch which their agent had sent to them, and on which, of course, he was authorized to act. We think it is very clearly to be distinguished from this case. In that case the telegraph company was held liable.

Judge Boynton, in delivering the opinion for the majority of the court, announced three propositions, perhaps four.

First. That the verdict was sustained by sufficient evidence. That he held as a fact.

Then, as propositions of law, he held that the special agreement that is shown in the case, whereby the company says it will not be liable unless the message is repeated, was not binding, that the company could not relieve itself from its own negligence by that agreement; that did not relieve the telegraph company from the consequences of its own negligence.

Second: As a matter of law, Judge Boynton announces that the failure to transmit the message as delivered is *prima facie* evidence of negligence.

Third: As a matter of law, he holds that that message was not obscure; that is all the propositions of law.

Judge Okey dissented in this case, and he said that the verdict was not supported by sufficient evidence, and taking that view of it, he then discusses what the law would be in case the verdict was not supported by sufficient evidence.

Claim was made that Cowpland, the agent of Griswold & Company, had notice of the erroneous message, or of the fact that the message was erroneous before he bought a bushel of flax seed. That was denied on the other side. Judge Okey says that it is clear that Cowpland did know before he bought any seed, and then he goes on and discusses what the law would be in that case, and nothing he announces in that

regard is at all at variance with the opinion of the court as delivered by Judge Boynton.

Attention is called to Ayer v. Telegraph Co., 79 Me. 493 [21 Am. & Eng. Corp. Cases 145], where there was a mistake made in a message about some lath. Without stopping to read the case, it shows there was a contract completed between the parties, and that being true it was held that the telegraph company was liable for the mistake it made in its message.

The case referred to in 25 Enc. Law, (1 ed.) page 890, Western Union Tel. Co. v. Shotter, 71 Ga. 760, shows that there was a contract complete between the parties, that the contract was different from what it would have been, because of the negligence of the telegraph company.

It is true that in neither of these cases was there a performance until after the mistake was known, but there was a complete contract between the parties, and that being binding, the party who lost by it held the telegraph company.

As being applicable as well to cases of this sort involving telegraph messages as to any other contracts, the rule of law seems to be such as is stated in 2 Townsend on Negligence (2 ed. 1886), 858, par. 20, where it is said that the law, for wise reasons, imposes upon the parties subjected to injury for the breach of a contract the active duty of making reasonable exertions to render the injury as light as possible. Public interests and sound morality accord with the law in demanding this, if the injured party, through negligence or wilfulness, allows the damage to be unnecessarily enhanced, the increased loss justly falls upon him.

Applying that principle here, although it was not a contract as between the parties, yet there was to be some loss, at least the expense of the message, and certainly a loss to the cereal company if it was mistaken or had been led into making a contract at $164 per thousand sacks less than what the property ought to have brought, but before any contract was made and before any goods were delivered it knew of that.

Now, neither good morals, it seems to us, nor sound reason, would allow the company to go on and furnish those goods and charge it up to the telegraph company.

We think there was error in the judgment of the court below and it is reversed, and the case remanded to the court of common pleas.